BOB HOWARD, d/b/a Bob Howard, Builder, Plaintiff-Appellant, v. JACK JAY, Defendant-Appellee.

Fourth District   No. 4—89—0758

Opinion filed September 20, 1990.

Bob Howard, of Oakley, appellant *pro se.*

No brief filed for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

■ Plaintiff Bob Howard appeals *pro se* from a judgment for defendant Jack Jay in an action to recover the contract price due under a construction contract between plaintiff and defendant. The trial court found plaintiff had not substantially complied with the terms of the contract and plaintiff was not entitled to recover on a *quantum meruit* theory. Plaintiff argues the trial court's findings are against the manifest weight of the evidence. Defendant has not filed a brief in this court. Because the record is simple and the claimed error is such that we can easily decide the case without the aid of appellee's brief, we will address the merits of plaintiff's appeal. (*First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 345 N.E.2d 493.) For the reasons that follow, we reverse.

Only those facts necessary to a resolution of the issue before us will be recited.

In May 1988, plaintiff and defendant entered into a written agreement whereby plaintiff would build a foundation for defendant's log cabin. The foundation was constructed on land owned by defendant and 300 yards away from defendant's present residence. The parties agreed on a price of $7,820. During construction, plaintiff alleged defendant asked that additional materials be provided, including, *inter alia,* steel to reinforce the foundation walls and windows. Defendant also asked plaintiff to do some plumbing work. According to plaintiff, the amount due under the contract, including the extras defendant requested, was $10,428.62. After the work was completed in September 1988, defendant refused to pay plaintiff anything under the contract. As an affirmative defense to plaintiff's action, defendant alleged plaintiff did not perform the work in a workmanlike manner and did not substantially perform the contract because the floor of the foundation was not level and the walls were cracked.

At trial, Roy Roush, a contractor in the concrete business for 32 years, testified for plaintiff that in his expert opinion, plaintiff did a fair job on the foundation. Roush explained that concrete floors are

never completely level and any variances in the walls and floors in defendant's foundation were within normal range. Roush opined defendant could put a house on the foundation, without any alteration. Roush noted that while the foundation was open to the elements from November 1988 to the time of trial in May 1989, the weather had not been bad enough to damage the foundation.

Plaintiff testified he had been in the concrete business since 1953. After plaintiff began to dig the footings for the foundation, defendant asked plaintiff to put steel in the walls and asked for four basement windows. When plaintiff finished the walls at the end of August 1988, he asked defendant for an installment payment under the contract of $6,036. Defendant told plaintiff he would have the money in a couple of days but defendant never paid plaintiff the installment. According to plaintiff, defendant never complained about the work up to that point. Plaintiff gave defendant the final bill on September 14, 1988, which included the extra charges for materials and work defendant requested. After getting the bill, defendant did not say anything to plaintiff. Plaintiff gave defendant a substitute bill two weeks later after removing a double charge. Plaintiff stated defendant again did not complain about his work. Plaintiff took some pictures of the foundation, which were admitted into evidence, after defendant first complained about the work and refused to pay the contract price at the end of September 1988.

Robert Neil, an employee of plaintiff who worked on defendant's job, stated he thought the work on the foundation was pretty good. Neil stated defendant's job was the first foundation he had worked on. At the time of trial, Neil had been working on laying foundations for one year. He stated the work on defendant's foundation compared favorably to the subsequent jobs he had worked on, for which no complaints were received.

Defendant's live-in girl friend testified defendant always wanted steel in the foundation walls and two windows and, therefore, these were included in the original price. The girl friend stated she and defendant were not happy with plaintiff's work when they received the final bill. She stated defendant called plaintiff several times to complain about the quality of the work before the final bill was presented.

Mike Hodges, a former employee of plaintiff who worked on defendant's foundation, testified for defendant that he disagreed with plaintiff on how to construct the footings for the foundation. Hodges stated the steel reinforcing rods for the walls were not tied together in a square as he had done on previous jobs for other contractors.

Hodges, who had been a concrete finisher for 12 years, stated (1) the boards used for the wall forms were not strong enough to hold the walls straight for the concrete; (2) the bottom of the forms were not secured properly with lag bolts but were secured with concrete nails which are known to pop out when the forms are jarred; (3) the walls for the crawl-space area were not secured properly; (4) the footings for the porch area were built on top of the ground instead of three feet down into the ground; (5) the sand under the basement floor was not packed or termited; (6) the day the floor was poured, the truck sat for one hour waiting to pour the concrete, causing the mud to get hot, which then caused the floor to crack almost immediately after being poured; (7) the floor was uneven because there were not enough workers that day to trowel out the floor; and (8) the braces for the windows should have had crisscross braces inside the outer braces so they would not buckle under the weight of the concrete. Hodges stated that after they began defendant's job, plaintiff went into the hospital for one week and, thus, did not come out to the site for one week. Hodges stated the work on defendant's foundation was of poor quality and that he would remove the floor.

On cross-examination, Hodges stated he was fired by plaintiff after defendant's job was completed and he had not worked for any contractor since because plaintiff told Hodges he was going to see that Hodges never worked for another contractor. Hodges also stated he did not know whether a house could be put on the foundation as it was.

Robert Sullivan, the building inspector and zoning enforcement officer, testified he inspected the footings of the foundation on August 10, 1988. He found the general workmanship was poor because the walls were not straight and the windows were buckled, not square. He noted the floors were not level and there was one-half inch of water in the corners of the floor. Sullivan stated the floor could be used but he would have it redone by having it taken out or repoured. On cross-examination, Sullivan stated the foundation was strong enough to hold any house put on it but aesthetically, it looked bad. Sullivan also stated the foundation would not crack or leak any more than any other concrete floor. Sullivan further stated the weather had no effect on the workmanship of the foundation. In response to a question from the court, Sullivan stated sloppy workmanship causes problems for a house put on a foundation where the house is a prefabricated house. In those cases, there is only one-half inch available around the foundation in case of errors in construction.

Defendant testified the items plaintiff added to the original con-

tract price were included in the original agreed price and the only thing extra was the plumbing work. Defendant stated he saw plaintiff at the site a few times but most often he saw Hodges. Defendant complained to plaintiff over the phone at night about the footings not being square. Defendant stated he was not happy with plaintiff's work and it was questionable whether he could use the foundation at all. Defendant stated the basement floor was "junk" and, at a minimum, he was going to have to take the floor out and have the walls redone. Defendant estimated it would cost him $4,000 more to correct the defects in the foundation. Defendant stated he told plaintiff the night he received the first bill that the walls were uneven. Defendant told plaintiff he would pay an installment under the contract before he saw how poorly the floor was poured and finished. Defendant stated another contractor told him he could put his log cabin on the foundation but the problem was that "it looked like shit." Defendant stated the cost of a new floor was in addition to the $3,475 needed to repair the defects in the foundation. No evidence was presented as to the cost of correcting the floor. Defendant admitted the cabin could be made to fit the foundation.

In rebuttal, Neil testified plaintiff fired Hodges after receiving complaints from other customers about him drinking and using profanity on the job. Neil also stated defendant came by the jobsite every day and did not complain about the quality of the work. Neil stated he measured the foundation walls in the fall of 1988 and found they were only off by five-eighths of an inch.

Plaintiff testified in rebuttal that he was at the defendant's jobsite every evening. He recalled showing defendant the forms for the walls and defendant was satisfied. Plaintiff stated that when he gave defendant the final bill on September 14, 1988, defendant complained only about the double charge which was later corrected in the September 26, 1988, bill. Plaintiff stated that when he went to collect the balance due under the contract from defendant on September 27, he found defendant and Hodges at the jobsite together. Defendant was laughing and he told plaintiff, "You'll have to go to court to get your money." Plaintiff measured the walls and the floor and found they were off by only five-eighths of an inch and one-half inch in spots, respectively. Plaintiff also recalled defendant told him he wanted to change the design of the log cabin and it would cost him more to build the cabin with the changes. Plaintiff opined the increased costs defendant spoke of could be due to defendant's change of design.

Plaintiff argues he substantially complied with the contract and

the trial court's finding to the contrary is against the manifest weight of the evidence.

■■ ■ Under the doctrine of substantial performance, the general rule regarding building contracts is that a builder is not required to perform perfectly but, rather, is only held to a duty of substantial performance in a workmanlike manner. (*Levan v. Richter* (1987), 152 Ill. App. 3d 1082, 1092, 504 N.E.2d 1373, 1380, citing *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.* (1985), 132 Ill. App. 3d 260, 264, 477 N.E.2d 513, 517.) An important factor in determining whether a builder has rendered substantial performance is the actual receipt of benefits by the purchaser. (*V & V Cement Contractors, Inc. v. La Salle National Bank* (1983), 119 Ill. App. 3d 154, 158, 456 N.E.2d 655, 658.) Depending on the facts of the case, an acceptance by the purchaser may amount to use of such a character as will evidence that performance was substantial, in which case the builder will be entitled to contract price less a deduction for defects in performance. (*Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 673-74, 356 N.E.2d 565, 570, citing 3A A. Corbin, Contracts §711, at 346 (1960).) A contractor whose work amounts to less than substantial performance may not recover on the contract but may recover under a quasi-contractual theory for the reasonable value of the services rendered less the damage suffered by the purchaser. *Erickson*, 132 Ill. App. 3d at 264, 477 N.E.2d at 517-18.

■ It is unnecessary for us to determine whether plaintiff substantially performed under the contract because we believe plaintiff is entitled to recover the reasonable value of his services. The evidence established that while the walls of the foundation are not even with one another at the top edge, and the basement floor is uneven in spots, the foundation, as it now stands, may be used to support the house defendant wants to build. Further, there is no evidence in the record other than defendant's uncorroborated statements that the walls of the foundation are cracked. As defendant admitted, the problem with the foundation is how it looks. The evidence showed that defendant hired another contractor to determine if the log cabin may be placed on the foundation and that contractor told defendant that because the walls of the foundation plaintiff constructed are thicker than the standard walls used in house foundations, defendant's house may be placed on the foundation. Even accepting defendant's evidence, there was benefit to defendant. Further, a fair inference can be drawn from defendant's testimony that he is going to use the foundation as planned. This inference is substantiated by defendant's closing argument, "Larry Bird *** is going to go ahead and build the log

cabin on top of the foundation." Any defects do not affect the function of the foundation which is to support defendant's house.

Plaintiff next points out the trial court made no findings as to the contract price. In its order, the trial court stated, "the cost of repair and the cost of a new basement *** is equal to the amount the plaintiff is requesting." On remand, the trial court should determine the reasonable value of plaintiff's services and deduct $3,475 as defendant's damages for defects in plaintiff's performance.

This cause is reversed and remanded to the trial court for proceedings consistent with this opinion.

Reversed and remanded.

KNECHT, P.J., and LUND, J., concur.